# EXHIBIT B

## AFFIDAVIT OF KENDALL HAYFORD

STATE OF WYOMING )
)
COUNTY OF FREMONT )

**KENDALL HAYFORD**, being duly sworn, states as follows:

1. I am of the age of majority and competent to testify to the matters contained herein.

2. I am the Vice President, Branch Manager of Wyoming Community Bank ("WCB") in Lander, Wyoming.

3. I have been provided with copies of a "Deposit Account Control Agreement" dated May 10, 2021, a "WCB Attestation" dated May 7, 2021, another "WCB Attestation" dated May 11, 2021 and a letter dated May 19, 2021 with the "Re" line "Wyoming Community Bank Anti-Money Laundering Program." All four of those documents (the "WCB Documents") accompany this affidavit as Exhibit A.

4. I affirm that the signature of "Kendall Hayford" on each of the four WCB Documents is not my signature.

5. Prior to receiving the WCB Documents subsequent to the dates contained on each of those documents, I had no knowledge of any of them and had never seen any of them previously.

6. The representation set forth in the two "WCB Attestations" contained in Exhibit B is false, to my knowledge, and does not accurately reflect the bank's records.

7. I also have been provided with emails sent to and received by the email address khayford@wyocommunityb.com.

Kendall Hayford Affidavit
Page 1 of 3

8. I affirm that the email address khayford@wyocommunityb.com is not my email address at WCB (or otherwise). I have never used that email address.

9. Prior to receiving the emails bearing the address khayford@wyowcommunityb.com, I had no knowledge of any of those e-mails or the email address khayford@wyowcommunityb.com, nor had I ever seen those emails or the email address khayford@wyowcommunityb.com.

10. The emails bearing the address khayford@wyowcommunityb.com represent on their face that the phone number for Kendall Hayford is 307-310-5096.

11. I affirm that the 307-310-5096 phone number is not my personal phone number or business phone number. I have never used that telephone number.

12. Prior to receiving the emails bearing the address khayford@wyowcommunityb.com, I had no knowledge of the 307-310-5096 phone number, nor had I ever seen the 307-310-5096 phone number before, to the best of my knowledge.

13. Until I was provided with the WCB Documents and the emails bearing the address khayford@wyowcommunityb.com, I had no knowledge of any loan agreement between Ria R Squared Inc. and Paul McCown or McCown Enterprises LLC.

14. To my knowledge, neither Paul McCown nor any entity he owns or controls has ever held hundreds of millions of dollars in an account or accounts at WCB because WCB would not be capable of holding such sums.

15. On May 10, 2021 I received a voicemail message, at my bank telephone number, from an individual who identified himself as Brian Kim calling in connection with Paul

McCown. Later that day, I asked Mr. McCown what the voicemail was about and he responded that he had "no idea."

**FURTHER AFFIANT SAYETH NOT.**

DATED this 10th day of June, 2021.

                                                   Kendall Hayford

**STATE OF WYOMING** )
                       ) ss.
**COUNTY OF** Fremont )

The foregoing *Affidavit of Kendall Hayford* was verified, subscribed, and sworn before me by *Kendall Hayford*, this 10 day of June, 2021.

Witness my hand and official seal.

PATRICIA A. O'NEAL - NOTARY PUBLIC
COUNTY OF FREMONT    STATE OF WYOMING
My Commission Expires 05-01-2023

Notary Public

My commission expires: 5-1-23

Affidavit of Kendall Hayford
Page 3 of 3

# Exhibit A

# DEPOSIT ACCOUNT CONTROL AGREEMENT

**Wyoming Community Bank**

Account Number: **3668**
[insert acount # by WCB]

This Deposit Account Control Agreement ("Agreement") is entered into this <u>10th</u> day of <u>May          2021</u>, between Wyoming Community Bank ("Bank"), _____ ("Secured Party"), and <u>Paul D. McCown</u> ("Client").

All parties agree as follows:

1. **Account.** Bank maintains one or more demand, savings, passbook, or other similar accounts which are identified above in which Client has an interest according to Bank's records. The Account is subject to Bank's Business Account Disclosure and Agreement to the extent not directly in conflict with the provisions of this Agreement (provided, however, that in the event of any such conflict, the provisions of this Agreement shall control).

2. **Security Interest.** Client has granted Secured Party a security interest in the above account(s) and in all funds now or later deposited into or held in such account(s), including without limitation any interest accruals, and in any renewals, replacements or rollovers of such accounts (each a "Substitute Account") regardless of the number of such Substitute Accounts. All of the foregoing assets are collectively referred to as the "Account."

3. **Other Liens.** Client represents and warrants to Secured Party and Bank that it has not assigned or granted a security interest in the Account except to Secured Party, and Client agrees that it will not permit the Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Secured Party's security interest referred to herein.

4. **Client's Rights in Account.** *[The Secured Party must choose one of the two options in this section.]*

    <u>X</u>  (a) Client retains the right to withdraw funds from the Account until Bank receives a Notice of Exclusive Control from Secured Party as set forth below; or

    ___  (b) Client does <u>not</u> retain the right to withdraw funds from the Account. Only Secured Party may do so.

5. **Control of Account.** This Agreement provides Secured Party with "control" of the Account, as legally defined under Article 8 and Article 9, as applicable, of the Uniform Commercial Code, for purposes of perfecting its security interest in the Account. Bank, Secured Party and Client agree that Bank will comply with instructions ("Instructions") as to the withdrawal or disposition of any funds credited to the Account, and as to any other matters relating to the Account, received from Secured Party without Client's further consent. If Secured Party has chosen Section 4(a) Bank may comply with Instructions received from Client as owner of the Account until Bank acknowledges receipt of a Notice of Exclusive Control from Secured Party and has a reasonable

opportunity to comply with it; thereafter, Bank shall only comply with Instructions received from Secured Party. The Notice of Exclusive Control must be substantially in the form of Exhibit A, must be signed by an authorized representative of Secured Party, and must be acknowledged by Bank. Secured Party's Instructions may include giving stop payment orders for any items being presented to the Account for payment. If Secured Party has chosen Section 4(b), then effective as of the date of this Agreement, Bank shall treat the Account as if Bank had received a Notice of Exclusive Control.

6. **Bank's Authorization and Liability**. Bank is authorized to rely on all Instructions from Secured Party, even if the Instructions are contrary to the Client's instructions or demands or result in the dishonoring by Bank of items presented for payment from the Account. Bank has no duty to determine whether Client's obligations to Secured Party are in default. Bank also has no duty to inquire or determine whether Secured Party is entitled to provide the Notice of Exclusive Control or any Instructions to Bank, and Bank may rely on any notices or communication it believes in good faith to be genuine and given by the appropriate party. Bank will have no liability to Client for wrongful dishonor of any items resulting from Bank's following the Instructions of Secured Party. Notwithstanding any other provision in this Agreement, in the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against Client, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against Client, Bank may act as Bank deems necessary to comply with all applicable provisions of governing statutes, and shall not be in violation of this Agreement as a result. Bank shall be permitted to comply with any writ, levy, order or other similar judicial or regulatory order or process concerning the Account, and shall not be in violation of this Agreement for so doing.

7. **Fees**. The fees and charges applicable to the Account are shown on the Schedule of Fees and Related Charges for Business Accounts, as may be revised from time to time, and Client agrees to pay these fees and charges directly from the Account. Client may incur additional charges as described in Section 9 of this Agreement and in the Bank's Business Account Disclosure and Agreement.

8. **Returned Items**. Bank will pay returned items by debiting the Account. Client agrees to pay any returned items.

9. **Priority**. Nothing contained in this Agreement constitutes a waiver, release or subordination of any present or future rights which Bank has or may have in the Account (whether described as rights of setoff, banker's liens, chargeback or otherwise) with respect to (a) items returned unpaid to the Account; (b) overdrafts on the Account; (c) automated clearing house transfer or presentment warranties made against Bank in connection with items deposited to the Account; (d) Bank's usual and customary charges for services rendered in connection with the Account; (e) any lien arising in connection with any loan or other credit relationship between Client and Bank; or (f) any adjustments to the Account relating to encoding errors or other adjustments as a result of customary banking practices. Secured Party agrees that Bank may exercise Bank's rights and remedies in connection with any liens, security interests, or claims it may have in the Account at any time, including after Bank's receipt of a Notice of Exclusive Control. If the balances in the Account are not sufficient to compensate Bank for any of the above items or any items described in Sections 7 and 8 herein, Client agrees to pay Bank on demand the amount due Bank, and if Client fails to so pay Bank immediately upon demand, Secured Party agrees to pay Bank the amount due within five (5) days after Bank's demand to Secured Party to pay any amount received by Secured Party with respect to such items.

10. **Indemnity**. Client will indemnify and hold Bank, its officers, directors, employees, attorneys, and agents harmless against all claims, liabilities, and expenses arising out of this Agreement (including reasonable attorneys' fees and disbursements), except to the extent such claims, liabilities, or expenses are caused by Bank's gross negligence or willful misconduct. Secured Party, after sending a Notice of Exclusive Control over the Account, will indemnify and hold Bank, its officers, directors, employees, attorneys, and agents harmless against all claims, liabilities, and expenses arising out of this Agreement (including reasonable attorneys' fees and disbursements), except to the extent such claims, liabilities, or expenses are caused by Bank's gross negligence or willful misconduct. In no event will Bank be liable for any special, indirect, exemplary or consequential damages, including but not limited to lost profits. In addition to its rights under Section 6, Bank will be excused from failing to act or delay in acting, and no such failure or delay shall constitute a breach of this Agreement or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, flood, earthquake or other natural disaster, breakdown of public or private or common carrier communications or transmission facilities, equipment failure, or negligence or default of Client or Secured Party; or (ii) such failure or delay resulted from Bank's reasonable belief that the action would violate any of Bank's guidelines, or other guidelines, rules, judgments or regulations of any governmental authority.

Client agrees to pay Bank, upon receipt of Bank's invoice, all costs, expenses and fees incurred by Bank in the preparation and administration of this Agreement (including any amendments hereto or instruments or agreements required hereunder).

11. **Statements**. Bank will send copies of all statements for the Account to: [*The Secured Party may check one or both options in this section.*]

| | |
|---|---|
| X | Client |
| X | Secured Party, at Client's expense |

12. **Termination**. Secured Party may terminate this Agreement by giving Bank and Client no fewer than five (5) days' prior written notice. Bank may terminate this Agreement by giving Secured Party and Client thirty (30) days' prior written notice of termination. Client may only terminate this Agreement with the written consent of Secured Party, and only after thirty (30) days prior written notice to Bank, approved in writing by Secured Party. Notwithstanding anything herein, Bank may terminate this Agreement (i) at any time by written notice to Client and Secured Party if Bank becomes obligated to terminate this Agreement or to close the Account under any statute, rule, or regulation binding upon the Bank, or any order, judgment, decree or injunction, or a garnishment, restraining notice or other legal process, directing, or prohibiting or otherwise restricting, the disposition of the funds in the Account; and (ii) upon five (5) Business Days' notice to the other parties if either Client or Secured Party breaches any of the terms of this Agreement or any other agreement either has with Bank. In the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against the Client, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against the Client, or if Client admits in writing its inability to pay its debts when due or a public announcement is made that Client has or intends to file bankruptcy, dissolve, wind-down its business or liquidate, sell or otherwise dispose of all or substantially all of its assets, then notwithstanding anything in this Agreement to

the contrary, Bank reserves the right, solely in its discretion, to take any action, or seek any assurances, as Bank may deem necessary prior to complying with any Instructions, and shall not be in violation of this Agreement as a result. The provisions of Sections 6 and 10 shall survive any termination of this Agreement.

13. **Relationship of the Parties**.  Nothing in this Agreement shall create any agency or fiduciary relationship between Client, Secured Party and Bank.

14. **Amendments**. This Agreement may only be amended by a writing, signed by Bank, Secured Party and Client, which may be signed in counterparts.

15. **Notice**. Written notice to each party is to be provided at the respective addresses shown below, and shall be effective upon delivery. The addresses to which notices or other communications are to be given may be changed from time to time by notice sent under this provision. Notices sent by email must be scanned PDFs including the live signatures of authorized persons. Secured Party acknowledges that Bank may not be able to respond to a Notice of Exclusive Control if the Secured Party does not deliver the Notice to the address listed below; and Secured Party agrees that Bank will not be held liable for any failure to respond to a Notice of Exclusive Control that Secured Party does not deliver to the address listed below.

> Wyoming Community Bank
> Attn: Kendall Hayford,
> VP Branch President
>
> 1700 N. Federal Blvd.
> Riverton, WY 82501
> Tel: 1-307-310-5096
> Email: khayford@wyocommunityb.com

| **Secured Party** | **Client** |
|---|---|
| Attention: M.K. David Kang | Attention: Paul Daniel McCown |
| Address: 575 Lexington Ave. 4th Floor | Address: |
| City, State, and Zip: NY, NY 10022 | City, State, and Zip: |
| Fax: | Fax: |
| Tel: 213-364-2848 | Tel: |
| Email: operations@rsquaredia.com | Email: |

16. **Counterparts**. This Agreement may be signed in counterparts, which when signed by all parties constitute one agreement. Until this Agreement is signed by all parties and accepted by Bank, it is neither enforceable against nor binding on Bank. To the extent that Bank has been asked to hold its signature in escrow, the parties agree that this Agreement is not accepted by Bank until such time as Bank receives, and has a reasonable period of time to act upon, written request by Secured Party to release Bank's signature from escrow. Any communication with respect to the foregoing sentence shall be to the addresses of the parties found in the Notice section of this Agreement.

17. **Waiver.** EACH PARTY WAIVES ANY RIGHT IT HAS TO A JURY TRIAL IN ANY ACTION ARISING FROM THIS AGREEMENT. THE PREVAILING PARTY IN ANY ACTION IS ENTITLED TO REASONABLE ATTORNEY FEES AND COSTS.

18. **Governing Law.** This Agreement will be governed by and be construed in accordance with the laws of the State of New York, without regard to conflict of laws principles.

**Secured Party**
Ria R Squared Inc.
By: _[signature]_
Print Name: M.K. David Kang
Title: President and CEO
Date: 5/10/2021

**Client**
Paul Daniel McCown
By: _____
Print Name: _____
Title: _____
Date: _____

Wyoming Commuity Bank
By: _[signature]_
Print Name: Kendall Hopford
Title: VP
Date: 5/10/21

Exhibit A
Notice of Exclusive Control

To: Wyoming Community Bank ("Bank")
From: Ria R Squared Inc. ("Secured Party")
Re: Paul Daniel McCown ("Client")
Date: May 10th, 2021
Account Number(s): ▓▓▓▓ 3668

Pursuant to the Deposit Account Control Agreement dated: May 10th, 2021 ("Agreement") entered into among Bank, Client and Secured Party, Secured Party hereby notifies Bank of Secured Party's exercise of Secured Party's rights under the Agreement, and directs Bank to cease complying with all instructions or directions from Client or Client's agents. Secured Party hereby certifies that it is entitled to exercise its rights under the Agreement, that Secured Party has a right to all or part of the funds in the Account, and agrees to specify the amount of the funds in the Account due to Secured Party.

Secured Party agrees that upon receipt of this Notice of Exclusive Control, Bank may continue to exercise Bank's rights and remedies as permitted under the Agreement and under any applicable laws.

Secured Party hereby certifies that the person executing this Notice of Exclusive Control is an officer, representative or agent of Secured Party authorized to act on behalf of Secured Party and to make the representations and agreements contained in this Notice of Exclusive Control.

SECURED PARTY:     Ria R Squared Inc.

By: _[signature]_
Title: President and CEO
Date: 5/10/2021

ACKNOWLEDGED BY:   WYOMING COMMUNITY BANK

By: _[signature]_
Title: VP
Date: 5/10/21



To whom it may concern,

The purpose of this document is an attestation of the account balance of Paul McCown's personal bank account, ending in -3668. As of today, May 7, 2021, the account balance is $761,481,265.21.

I affirm this balance in my capacity as an officer of the bank, its Corporate Vice President and Branch President.

Sincerely,

Kendall S. Hayford
VP Branch President



To whom it may concern,

The purpose of this document is an attestation of the account balance of Paul McCown's personal bank account, ending in ▇▇▇3668. As of today, May 11, 2021, the account balance is $761,481,265.21.

I affirm this balance in my capacity as an officer of the bank, its Corporate Vice President and Branch President.

Sincerely,

Kendall S. Hayford
VP Branch President



May 19, 2021

RE: Wyoming Community Bank Anti-Money Laundering Program

To Whom It May Concern:

Wyoming Community Bank ("WCB") is a United States ("U.S.") registered bank holding company regulated by the Federal Reserve Bank of St Louis ("FRB"). WCB and its financial institution subsidiaries1 are subject to U.S. statutory laws and regulations regarding Anti-Money Laundering ("AML") and Counter Terrorist Financing ("CTF"), such as the Bank Secrecy Act ("BSA"), as amended by, inter alia, the USA PATRIOT Act of 2001. WCB is also subject to the sanctions programs administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"). WCB and its subsidiaries are regulated and regularly examined by, among others, the FRB, the Office of the Comptroller of the Currency ("OCC"), the United States Securities and Exchange Commission ("SEC"), the Financial Institution Regulatory Authority ("FINRA"), and the Commodities and Futures Trading Commission ("CFTC").

As required by law, WCB and its subsidiaries have implemented a risk-based, enterprise-wide BSA/AML Program that complies with both the specific provisions and the spirit of all relevant laws and regulations. Accordingly, WCB's BSA/AML Program includes, but is not limited to: (1) the appointment of a BSA/AML officer; (2) a Customer Due Diligence Program ("CDD"), which incorporates a Customer Identification Program ("CIP") and appropriate due diligence for customers depending on the risk profile; (3) enhanced due diligence on higher risk customers, such as Senior Foreign Political Figures/Politically Exposed Persons; (4) regular independent testing; (5) an AML training program; (6) processes and systems to monitor customer transactions and to identify potentially suspicious activity; (7) reporting of suspicious activity to appropriate regulatory bodies; (8) a policy of forbidding direct or indirect service to shell banks; and (9) policies and controls to ensure compliance with the sanctions programs administered by OFAC. Relevant AML/CTF documentation and records are maintained for a period of at least 7 years after account closing. WCB cooperates fully with regulatory and law enforcement investigations and inquiries.

Sincerely,

Kendall S. Hayford
VP Branch President



# WYOMING COMMUNITY BANK
### It's A Local Thing

"Wyoming Community Bank" hereby confirms the following in accordance with the standards of a prudent professional and the applicable laws and regulations:

1. We maintain Anti Money Laundering & Counter Terrorist Financing ("AML/CTF") policies applicable to all employees and an on-going training program. We have implemented related procedures and controls including a procedure on suspicious activity reports;

2. We perform a risk assessment of the underlying investor, mandates and proxy holders using a combination of relevant risk factors prior to entering into a business relationship and obtain information on the purpose of the business relationship (Risk Based Approach);

3. We perform the identification and verification of the identity of the underlying investor based on the initial risk assessment. Where applicable, the identification and verification of the identity of our clients, beneficial owners, controlling parties and proxy holders is performed, such that the ownership and control structure of the underlying investors in particular legal persons, trusts and similar legal arrangements are understood and risks are assessed;

4. We perform enhanced due diligence on higher risk underlying investors and their beneficial owners, where applicable, including politically exposed persons and, where a relationship is established with countries or territories which do not or insufficiently apply AML-CTF measures;

5. We perform on-going monitoring of the business relationship to maintain KYC information current including detection of unusual transactions which are not consistent with the expected business activity, and where necessary, the origin of funds and origin of wealth;

6. We perform sanctions screening prior the account opening and on an on-going basis of the underlying investors, their beneficial owners, mandate and proxy holders where applicable. The sanctions lists are amongst others, the resolutions of the United Nations Security Council as well as acts adopted by the European Commission regarding CTF/EU sanction list. [In addition where applicable, we are required to comply with OFAC sanctions programs and perform sanctions screening against the listings of the US Department of Treasury, Office of Foreign Asset Control ("OFAC") ];

7. We retain investor due diligence documentation during a period of at least five years following the end of the business relationship and will make it available upon written request notwithstanding any applicable rules on confidentiality or local secrecy laws.

8. We do not enter into business relationship with shell banks or accept shell banks as underlying investors or beneficial owners;

Yours sincerely,

*[signature]*

Chief Compliance Officer AML Business Office