# EXHIBIT A

## MCCOWN ENTERPRISES LLC OPERATING AGREEMENT

This Operating Agreement (the "Agreement") is made effective as of November 11, 2020, by and among the individuals identified in Exhibit A (the "Members").

In consideration of the mutual covenants and conditions herein, the Members agree as follows:

### ARTICLE I

### ORGANIZATION

**1.1 Formation and Qualification.** Paul D. McCown (the "Organizer") has formed a limited liability company (the "Company") under the Wyoming Limited Liability Company Act, as may be amended from time to time (the Act), by filing Articles of Organization with the Wyoming Secretary of State.

**1.2 Governing Law.** This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Wyoming, including the Act, without regard to Wyoming's conflicts of laws principles. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any provision of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern to the extent permitted by the Act.

**1.3 Name.** The name of the Company shall be McCown Enterprises LLC. The business of the Company may be conducted under that name or, in compliance with applicable laws, any other name that the Voting Members deem appropriate or advisable. The Voting Members on behalf of the Company shall file any certificates, articles, fictitious business name statements and the like, and any amendments and supplements thereto, as the Voting Members consider appropriate or advisable.

**1.4 Term.** The term of the Company commenced on the filing of the Articles of Organization and shall be perpetual unless dissolved as provided in this Agreement.

**1.5 Office and Agent.** The principal office of the Company shall be at such place or places of business within or without the State of Wyoming as the Voting Members may determine. The registered agent shall be as stated in the Articles of Organization or as otherwise determined by the Voting Members.

**1.6 Purpose of Company.** The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be organized under the Act.

### ARTICLE II

### MEMBERSHIP INTERESTS, VOTING AND MANAGEMENT

**Section 2.1 Classification of Membership Interests.** The Company shall issue Class A Voting Capital (Voting Capital), to the Voting Members (the "Voting Members"). The Voting Members shall have the right to vote upon all matters upon which MEMBERS have the right to vote under the Act or under this Agreement, in proportion to their respective Percentage Voting Interest (Percentage Voting Interest) in the Company. The Percentage Voting Interest of a Voting Member shall be the percentage that is derived when the Member's Voting Capital account is divided by the total of all of the Voting Capital accounts.

The Company shall issue Class B, Nonvoting Capital ("Nonvoting Capital"). Members who own interests only in Nonvoting Capital ("Nonvoting Members") shall have no right to vote upon any matters.

**Section 2.2 Percentage Ownership and Voting Interests.** A Member's Ownership Interest ("Ownership Interest") is the total of his interests in Voting Capital and Nonvoting Capital, together with all of the rights, as a Member or Manager of the Company, that arise from such interests. The Percentage Ownership Interest ("Percentage Ownership Interest") of a Member shall be calculated by adding together that Member's Voting Capital Account and Nonvoting Capital Account, and then dividing this sum by the total of all of the Member's Voting Capital and Nonvoting Capital accounts.

**Section 2.3 Management by Voting Members.** The Voting Members shall manage the Company and shall have the right to vote, in their capacity as Managers, upon all matters upon which Managers have the right to vote under the Act or under this Agreement, in proportion to their respective Percentage Voting Interests in the Company. Voting Members need not identify whether they are acting in their capacity as Members or Managers when they act.

The Nonvoting Members shall have no right to vote or otherwise participate in the management of the Company. No Nonvoting Member shall, without the prior written consent of all of the Voting Members, take any action on behalf of, or in the name of, the Company, or enter into any contract, agreement, commitment or obligation binding upon the Company, or perform any act in any way relating to the Company or the Company's assets.

**Section 2.4 Voting.** Except as otherwise provided or permitted by this Agreement, Voting Members shall in all cases, in their capacity as Members or Managers of the Company, act collectively, and, unless otherwise specified or permitted by this Agreement, unanimously. Except as otherwise provided or permitted by this Agreement, no Voting Member acting individually, in his capacity as a Member or Manager of the Company, shall have any power or authority to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable for any purpose.

Unless the context requires otherwise, in this Agreement, the terms "Member" or "Members," without the qualifiers "Voting" or "Nonvoting," refer to the Voting and Nonvoting Members collectively; and the terms "Manager" or "Managers" refers to the Voting Members.

**Section 2.5 Liability of Members.** All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

**Section 2.6 New Members.** The Voting Members may issue additional Voting Capital or Nonvoting Capital and thereby admit a new Member or Members, as the case may be, to the Company, only if such new Member (i) is approved unanimously by the Voting Members; (ii) delivers to the Company his required capital contribution; (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto; and (iv) delivers such additional documentation as the Voting Members shall reasonably require to so admit such new Member to the Company.

Upon the admission of a new Member or Members, as the case may be, to the Company, the capital accounts of Members, and the calculations that are based on the capital accounts, shall be adjusted appropriately.

**Section 2.7 Anti-Dilution.** Notwithstanding Section 2.7 above, or any other provisions set forth herein, the Voting Members may not issue any additional Voting Capital or Nonvoting Capital if such issuance would reduce the total Percentage Ownership Interest of any Nonvoting Members without the express written consent of such Nonvoting Members in each case.

**ARTICLE III**

**CAPITAL ACCOUNTS**

**3.1 Initial Capital Contributions.** Each original Member to this Agreement shall make an initial Capital Contribution to the Company in accordance with Exhibit A, at the time of each Member's execution of this Agreement.

**3.2 Capital Accounts.** A separate capital account shall be maintained for each Member's ownership interest in Class A Voting Capital (the Voting Capital Account) and Class B Nonvoting Capital (the Nonvoting Capital Account).

The capital account of each Member shall be increased by (i) the amount of any cash and the fair market value of any property contributed to the Company by such Member (net of any liability secured by such contributed property that the Company is considered to assume or take subject to), (ii) the amount of income or profits allocated to such Member.

The capital account or accounts of each Member shall be reduced by (i) the amount of any cash and the fair market value of any property distributed to the Member by the Company (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to on account of his ownership interest), (ii) the amount of expenses or loss allocated to the Member.

No Member shall be obligated to restore any negative balance in his Capital Account. No Member shall be compensated for any positive balance in his Capital Account except as otherwise expressly provided herein.

The Members agree that the initial Capital Accounts of the Members on the date hereof are as set forth in Exhibit A.

**3.3 Additional Contributions.** If, at any time or times hereafter, the Voting Members shall determine that additional capital is required by the Company, the Voting Members shall determine the amount of such additional capital and the anticipated time such additional capital will be required; whether such additional capital shall be provided by the Members by way of additional Capital Contributions or by way of loans from Members; whether additional Capital Contributions, if any, shall be of in the form of Class A Voting Capital or Class B Nonvoting Capital. No Member shall be obligated, at any time, to guarantee or otherwise assume or become liable for any obligations of the Company or to make any additional Capital Contributions advances or loans to the Company, unless such obligations are specifically accepted and agreed to by such Member in writing.

## ARTICLE IV

## MANNER OF ACTING

**4.1 Officers and Agents of the Company.** The Voting Members may authorize any Member or Members of the Company, or other individuals or entities, whether or not a Member, to take action on behalf of the Company, as the Voting Members deem appropriate. Any Member may lend money to and receive loans from the Company, act as an employee, independent contractor, lessee, lessor, or surety of the company, and transact any business with the Company that could be carried out by someone who is not a Member; and the Company may receive from or pay to any Member remuneration, in the form of wages, salary, fees, rent, interest, or any form that the Voting Members deem appropriate.

The Voting Members may appoint officers of the Company who, to the extent provided by the Voting Members, may have and may exercise all the powers and authority of the Members or Managers in the conduct of the business and affairs of the Company. The officers of the Company may consist of a President, a Treasurer, a Secretary, or other officers or agents as may be elected or appointed by the Voting Members. The Voting Members may provide rules for the appointment, removal, supervision and compensation of such officers, the scope of their authority, and any other matters relevant to the positions. The officers shall act in the name of the Company and shall supervise its operation, within the scope of

their authority, under the direction and management of the Voting Members.

Any action taken by a duly authorized officer, pursuant to authority granted by the Voting Members in accordance with this Agreement, shall constitute the act of and serve to bind the Company, and each Member hereby agrees neither to dispute such action nor the obligation of the Company created thereby.

  **4.2 Meetings of Voting Members.** No regular, annual, special, or other meetings of Voting Members are required to be held. Any action that may be taken at a meeting of Voting Members may be taken without a meeting by written consent in accordance with the Act. Meetings of the Voting Members, for any purpose or purposes, may be called at any time by a majority of the Voting Members. The Voting Members may designate any place as the place of meeting for any meeting of the Voting Members. If no designation is made, the place of meeting shall be the principal place of business of the Company.

**ARTICLE V**

**ALLOCATIONS AND DISTRIBUTIONS**

  **5.1 Allocations of Profits and Losses.** Profits and losses shall be allocated among the Members in proportion to their Percentage Ownership Interests. Any special allocations necessary to comply with the requirements set forth in Internal Revenue Code Section 704 and the corresponding Regulations, including, without limitation, the qualified income offset and minimum gain chargeback provisions contained therein, shall be made if the Voting Members deem these actions to be appropriate.

  **5.2 Distributions.** Subject to applicable law and any limitations elsewhere in this Agreement, the Voting Members shall determine the amount and timing of all distributions of cash, or other assets, by the Company. Except as otherwise provided in this Agreement, all distributions shall be made to all of the Members, in proportion to their Percentage Ownership Interests. Except as otherwise provided in this Agreement, the decision as to whether to make distributions shall be within the sole discretion of the Voting Members.

All such distributions shall be made only to the Members who, according to the books and records of the Company, are the holders of record on the actual date of distribution. The Voting Members may base a determination that a distribution of cash may be made on a balance sheet, profit and loss statement, cash flow statement of the Company or other relevant information. Neither the Company nor the Members shall incur any liability for making distributions.

  **5.3 Form of Distribution.** No Member has the right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company.

**ARTICLE VI**

**TRANSFER AND ASSIGNMENT OF INTERESTS**

  **6.1 Resignation of Membership and Return of Capital.** For a period of one year after a Member's initial capital contribution, such Member may not voluntarily resign membership in the Company, and such Member shall not be entitled to any return of capital from the Company, except upon the written consent of all of the other Voting Members. During the second year after the initial capital contribution, a Member may voluntarily resign membership in the Company, but such Member shall be entitled to receive from the Company only the book value of the Member's Ownership Interest, adjusted for profits and losses to the date of resignation, unless otherwise agreed by the Voting Members. Subsequent to the second year after the initial capital contribution, a Member may voluntarily resign his

membership and shall be entitled to receive from the Company the fair market value of his Ownership Interest, adjusted for profits and losses to the date of resignation. Fair market value may be determined informally by unanimous agreement of all of the Voting Members, as well as the resigning Member. In the absence of an informal agreement as to fair market value, the Voting Members shall hire an appraiser to determine fair market value. The cost of any appraisal shall be deducted from the fair market value to which the resigning Member is entitled. The Voting Members may elect, by written notice that is provided to the resigning Member within thirty days after the resignation date, for the Company to purchase the resigning Member's Interest (whether the interest is being purchased at book value or fair market value) over a one-year period, in four equal annual installments, with the first installment being due sixty days after the Member's resignation.

**6.2 Death of a Member.** Upon the death of a Member, the Member's estate or beneficiary or beneficiaries, as the case may be, shall be entitled to receive from the Company, in exchange for all of the deceased Member's Ownership Interest, the fair market value of the deceased Member's Ownership Interest, adjusted for profits and losses to the date of death. Fair market value may be determined informally by a unanimous good-faith agreement of all of the Voting Members. In the absence of an informal agreement as to fair market value, the Voting Members shall hire an appraiser to determine fair market value. The cost of any appraisal shall be deducted from the fair market value to which the deceased Member's estate or beneficiary or beneficiaries is or are entitled. The Voting Members may elect, by written notice that is provided to the deceased Member's estate or beneficiary or beneficiaries, within thirty days after the Member's death, to purchase the deceased Member's Ownership Interest over a one-year period, in four equal installments, with the first installment being due sixty days after the Member's date of death.

**6.3 Restrictions on Transfer.** Except (i) as otherwise provided in this Article or (ii) upon the unanimous consent of all of the other Voting Members, no Member shall sell, hypothecate, pledge, assign or otherwise transfer, with or without consideration, any part or all of his Ownership Interest in the Company to any other person or entity (a "Transferee"), without first offering (the "Offer") that portion of his or her Ownership Interest in the Company subject to the contemplated transfer (the "Offered Interest") first to the Company, and secondly, to the Voting Members, at the purchase price (hereinafter referred to as the "Transfer Purchase Price") and in the manner as prescribed in the Offer.

The Offering Member shall make the Offer first to the Company by written notice (hereinafter referred to as the "Offering Notice"). Within twenty days (the "Company Offer Period") after receipt by the Company of the Offering Notice, the Company shall notify the Offering Member in writing (the "Company Notice"), whether or not the Company shall accept the Offer and shall purchase all but not less than all of the Offered Interest. If the Company accepts the Offer to purchase the Offered Interest, the Company Notice shall fix a closing date not more than twenty-five days (the "Company Closing Date") after the expiration of the Company Offer Period.

In the event the Company decides not to accept the Offer, the Offering Member or the Company, at his or her or its election, shall, by written notice (the "Remaining Member Notice") given within that period (the "Member Offer Period") terminating ten (10) days after the expiration of the Company Offer Period, make the Offer of the Offered Interest to the Voting Members, each of whom shall then have a period of twenty-five days (the "Member Acceptance Period") after the expiration of the Member Offer Period within which to notify in writing the Offering Member whether or not he or she intends to purchase all but not less than all of the Offered Interest. If two or more Voting Members of the Company desire to accept the Offer to purchase the Offered Interest, then, in the absence of an agreement between them, such Voting Members shall have the right to purchase the Offered Interest in proportion to their respective Percentage Voting Interests. If the other Voting Members intend to accept the Offer and to purchase the Offered Interest, the written notice required to be given by them shall fix a closing date not more than sixty days after the expiration of the Member Acceptance Period (hereinafter referred to as the "Member Closing Date").

The aggregate dollar amount of the Transfer Purchase Price shall be payable in cash on the Company Closing Date or on the Member Closing Date, as the case may be, unless the Company or the purchasing Voting Members shall elect by written notice that is delivered to the Offering Member, prior to or on the Company Closing Date or the Member Closing Date, as the case may be, to purchase such Offered Interest in four equal annual installments, with the first installment being due on the Closing Date.

If the Company or the other Voting Members fail to accept the Offer or, if the Offer is accepted by the Company or the other Voting Members and the Company or the other Voting Members fail to purchase all of the Offered Interest at the Transfer Purchase Price within the time and in the manner specified, then the Offering Member shall be free, for a period (hereinafter referred to as the "Free Transfer Period") of sixty days from the occurrence of such failure, to transfer the Offered Interest to a Transferee; provided, however, that if all of the Voting Members other than the Offering Member do not approve of the proposed transfer by unanimous written consent, the Transferee of the Offered Interest shall have no right to become a Member or to participate in the management of the business and affairs of the Company as a Member or Manager, and shall only have the rights of an assignee and be entitled to receive the share of profits and the return of capital to which the Offering Member would otherwise have been entitled. A Transferee shall be admitted as a Member of the Company, and as a result of which he or she shall become a substituted Member, with the rights that are consistent with the Membership Interest that was transferred, only if such new Member (i) is approved unanimously by the Voting Members; (ii) delivers to the Company his required capital contribution; (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto.

If the Offering Member shall not transfer the Offered Interest within the Free Transfer Period, his or her right to transfer the Offered Interest free of the foregoing restrictions shall thereupon cease and terminate.

**6.4 Involuntary Transfer of a Membership Interest.** A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member, or other involuntary transfer of Member's Membership Interest, shall constitute a material breach of this Agreement by such Member. The creditor, transferee or other claimant, shall only have the rights of an Assignee, and shall have no right to become a Member, or to participate in the management of the business and affairs of the Company as a Member or Manager under any circumstances, and shall be entitled only to receive the share of profits and losses, and the return of capital, to which the Member would otherwise have been entitled. The Voting Members, including a Voting Member whose interest is the subject of the charging order, lien, bankruptcy, or involuntary transfer, may unanimously elect, by written notice that is provided to the creditor, transferee or other claimant, at any time, to purchase all or any part of Membership Interest that was the subject of the creditor's charging order, lien, bankruptcy, or other involuntary transfer, at a price that is equal to one-half (1/2) of the book value of such interest, adjusted for profits and losses to the date of purchase.

## ARTICLE VII

### ACCOUNTING, RECORDS, AND REPORTING

**7.1 Books and Records.** The Company shall maintain complete and accurate accounts in proper books of all transactions of or on behalf of the Company and shall enter or cause to be entered therein a full and accurate account of all transactions on behalf of the Company. The Company's books and accounting records shall be kept in accordance with such accounting principles (which shall be consistently applied throughout each accounting period) as the Voting Members may determine to be convenient and advisable.

**7.2 Inspection of Books and Records.** Each Voting Member has the right, on reasonable request for purposes reasonably related to the interest of the person as a Member or a Manager, to: (a) inspect and copy during normal business hours any of the Company's records described in Section 7.1; and (b) obtain

from the Company promptly after their becoming available a copy of the Company's federal, state and local income tax or information returns for each fiscal year.

**7.3 Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other Person.

## ARTICLE VIII
## DISSOLUTION AND WINDING UP

**8.1 Dissolution.** The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of: the entry of a decree of judicial dissolution pursuant to the Act; or the unanimous approval of the Voting Members.

**8.2 Winding Up.** On the occurrence of an event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Voting Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the assets and liabilities of Company, shall cause such assets to be sold or distributed, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed. The Voting Members shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Members shall be entitled to reasonable compensation for such services.

**8.3 Statement of Cancellation.** The Voting Members conducting the winding up of the affairs of the Company shall cause to be filed in the office of, and on a form prescribed by the Wyoming Secretary of State, a statement of cancellation of the Articles of Organization on the completion of the winding up of the affairs of the Company.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**9.1 Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and reasonably believed by such Member to be in or not opposed to the best interests of the Company, except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member.

**9.2 Indemnification by Company.** The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage, or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys fees, and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party.

**9.3   Indemnification by the Members.** Each Member hereby agrees to indemnify and defend the Company, the other Members and each of their respective employees, agents, partners, members, shareholders, officers and directors and hold them harmless from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, court costs and attorneys fees and expenses)

suffered or incurred on account of or arising out of any breach of this Agreement by that Member or as a result of gross negligence or willful misconduct by that Member.

## ARTICLE X

## MISCELLANEOUS

**10.1 Notices.** Except as otherwise expressly provided herein, any notice, consent, authorization, or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth in the Company's records.

**10.2 Severability.** If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**10.3 Binding Effect.** Subject to Article VI, this Agreement shall bind and inure to the benefit of the parties and their respective Successors.

**10.4 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**10.5 Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, understandings, and agreements between or among the parties, regarding the subject matter hereof.

**10.6 Further Assurances.** Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments, and other documents, as may be necessary and proper to implement, complete, and perfect the transactions contemplated by this Agreement.

**10.7 Headings; Gender; Number; References.** The headings of the Sections hereof are solely for convenience of reference and are not part of this Agreement. As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require. All references to Sections and subsections are intended to refer to Sections and subsections of this Agreement, except as otherwise indicated.

**10.8 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective Successors nor shall anything in this Agreement relieve or discharge the obligation or liability of any third Person to any party to this Agreement, nor shall any provision give any third Person any right of subrogation or action over or against any party to this Agreement.

**10.9 Amendments.** All amendments to this Agreement shall be in writing and signed by all of the Members to the agreement at the time of the amendment.

**10.10 Attorneys Fees.** In any dispute between or among the Company and one or more of the Members, including, but not limited to, any Member Dispute, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs, and expenses including, without limitation, attorneys fees, costs, and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding, or arbitration. Attorneys fees shall

include, without limitation, fees incurred in any post-award or post-judgment motions or proceedings, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and prevailing party shall mean the party that is determined in the arbitration, action, or proceeding to have prevailed or who prevails by dismissal, default, or otherwise.

**10.11 Remedies Cumulative.** Remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Member may be lawfully entitled.

**10.12 Jurisdiction and Venue.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Wyoming or of the United States District Court for the District of Wyoming, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding or arbitration. Each Member agrees not to commence any action, suit or other proceeding arising from, relating to, or in connection with this Agreement except in such a court and each Member irrevocably and unconditionally consents and submits to the personal and exclusive jurisdiction of such courts for the purposes of litigating any such action, and hereby grants jurisdiction to such courts and to any appellate courts having jurisdiction over appeals from such courts or review of such proceedings.

**10.13   Authority.** Each individual executing this Agreement on behalf of a corporation or other entity warrants that he or she is authorized to do so and that this Agreement constitutes a legally binding obligation of the corporation or other entity that the individual represents.

*Signature Page Follows*

IN WITNESS WHEREOF, this Operating Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

**Member Names/Signatures**          **Dates**

*[signature]* Phillip McCown

Digitally signed by Phillip McCown
DN: cn=Phillip McCown, o, ou, email=pjlmac@gmail.com, c=US
Date: 2020.11.11 12:12:39 -05'00'

Phillip J. McCown                    11/11/20

*[signature]*                        11/12/2020

PAUL D. MCCOWN

## EXHIBIT A

## LLC MEMBERS AND INITIAL CONTRIBUTIONS

| Name | Percentage Ownership Interest |
|---|---|
| Phillip J. McCown *(Non-Voting Member)* | 5% |
| | |

Signatures                                    Dated

*[signature]*            **Phillip McCown**   Digitally signed by Phillip McCown
                                              DN: cn=Phillip McCown, o, ou,
                                              email=pjlmac@gmail.com, c=US
                                              Date: 2020.11.11 12:13:01 -05'00'

Phillip J. McCown                             11/11/20

*[signature]*                                 11/12/2020

PAUL D. MCCOWN