UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIA R SQUARED, INC.,                          Case No. 21-12937
                          Plaintiff,

v.

                                              Curtis Ivy, Jr.
PHILLIP MCCOWN,                               United States Magistrate Judge
                          Defendant.
_____/

## OMNIBUS OPINION AND ORDER

Before the Court is an unopposed motion for leave to file an unredacted copy of Defendant's expert witness list (ECF No. 57), Plaintiff's motion for partial summary judgment (ECF No. 69), Defendant's motion to compel the continuation of a deposition (ECF No. 73), Defendant's motion for summary judgment (ECF No. 74), Plaintiff's motion for sanctions against Defendant's counsel (ECF No. 81), and Defendant's motion to stay briefing on the motion for sanctions pending resolution of the dispositive motions (ECF No. 82).

For the reasons below, Plaintiff's motion for partial summary judgment is **GRANTED IN PART**, Defendant's motion for summary judgment is **GRANTED IN PART**, the motion to seal is **GRANTED**, the motion to compel the continuation of a deposition is **TERMINATED AS MOOT**, the motion for sanctions is **DENIED**, the motion to stay briefing on the motion for sanctions is **TERMINATED AS MOOT**, and this case is **DISMISSED**.

I.      **FACTUAL BACKGROUND**

Defendant's brother, Paul McCown, was convicted of wire fraud, sentenced

to a term of imprisonment, and ordered to pay restitution in connection with a loan

contract between Plaintiff and Paul in Wyoming.  (ECF No. 71-28).  Specifically,

Paul McCown fraudulently obtained a loan from Plaintiff for $15 million, minus

the loan origination fee, providing a loan total of $14.7 million.  There is also a

civil judgment against Paul McCown in Wyoming District Court for the same.

(ECF No. 71-33).

Before the fraud was uncovered, Paul made payments to various individuals,

including his brother, Defendant Phillip McCown.  Defendant received $375,000

on May 11, 2021, from his brother to his Fifth Third Bank savings account.  (ECF

No. 69-2).  On May 13, 2021, Defendant transferred $23,800 of that $375,000 to

his Fifth Third checking account.  Four days later, he used $23,579.27 to pay three

bills.  (*Id.* at PageID.2215, at ¶17).  On June 14, 2021, he withdrew $80 from his

checking account to spend on food, beverages, and a haircut.  (*Id.* at ¶ 18).  In total,

he spent $23,659.27 of the $375,000.

On June 21, 2021, Defendant learned that the Federal Bureau of

Investigation ("FBI") seized $351,300.67 from his Fifth Third savings account.

(*Id.* at PageID.2216, at ¶ 20).  Soon after, Paul McCown admitted fraudulently

obtaining the $15 million loan from Plaintiff to Defendant.  (*Id.* at ¶ 23).  And

2

Defendant was advised, by email from attorneys for Plaintiff in Wyoming, to consult counsel, to have counsel contact Plaintiff's attorneys, and demanded Defendant to forbear from transferring any portion of the $375,000. (*Id.* at PageID.2217, at ¶ 24). Defendant states the email was sent to an account he checks every 6-12 months; he read it on June 27, 2021. The email was sent June 4, 2021.[1] Defendant then hired counsel.

On July 12, 2021, Defendant produced documents in response to a subpoena issued by Plaintiff in the civil case brought against Paul McCown in Wyoming District Court. The documents included accounts statements showing the wire transfer from Paul to Defendant, Defendant's transfer of $23,800 to his checking account, and debits to pay bills totaling $23,579.27. (*Id.* at PageID.2218, at ¶ 29).

On September 30, 2021, Plaintiff's Wyoming counsel emailed Defendant's counsel demanding the return of the $23,699.33 remaining after the FBI seizure within ten days of the communication. (*Id.* at PageID.2218, at ¶ 30). Defendant instructed his attorney to negotiate a 30-day extension to return the money. Defendant's counsel believed an agreement was reached in which Defendant would return the funds within 30 days from October 4, 2021. (ECF No. 71-20, PageID.2638). On October 21, 2021, Defendant obtained the money to pay

---

[1] There is no genuine dispute about when Defendant had actual notice of the fraud. Plaintiff accepts that Defendant had notice, at the latest, on June 27, 2021, when he read the June 4, 2021 email.

3

Plaintiff. Defendant's counsel later informed him that Plaintiff's counsel would not accept the proposed agreement without additional payment to release all claims. (ECF No. 69-2, PageID.2219, ¶¶ 31-33). Specifically, Plaintiff's counsel would not agree to release all potential claims against Defendant without payment beyond the amount left after the FBI seizure. (ECF No. 71-20, PageID.2640, at ¶ 17). Defendant offered to answer questions or provide discovery to satisfy Plaintiff that there were no claims against him with respect to the loan. (*Id.* at PageID.2641, ¶ 18).

On December 17, 2021, Plaintiff commenced this lawsuit. Four days later, Defendant wrote a check to his attorney's law firm for $23,699.33. (ECF No. 69-2, PageID.2220, at ¶ 34). This amount was given to Plaintiff on February 7, 2022. (*Id.* at PageID.2242).

Defendant insists the money from his brother was given to him in consideration for a formula related to hand sanitizer which Paul McCown's company produced and sold during the early days of the pandemic. Defendant asserts that in exchange for the formula, he received a 5% share of the company during November 2020 (after Paul had begun production and sale of the sanitizer). Yet he did not make this exact assertion in his affidavit, nor is there other admissible evidence showing that the money was payment for the formula. In his

affidavit, he states the $375,000 was pursuant to his 5% share; he did not link his sanitizer formula and the 5% share.  (*See* ECF No. 71-8, PageID.2417-18, ¶ 13).

Additionally, according to Defendant, sales from the sanitizer were part of the list of receivables Plaintiff reviewed before loaning $14.7 million to Paul McCown.  (ECF No. 71, PageID.2291; ECF No. 71-14).

## II.   MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 69, 74)

### A.   Governing Standards

Summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evaluating a motion for summary judgment, the Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp*., 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp*., 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty*., 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

6

B.    Discussion

Plaintiff moves for summary judgment on its Michigan common law and statutory conversion claims.  Defendant moves for summary judgment on those claims and Plaintiff's third and final claim under the Michigan Uniform Voidable Transactions Act.

1.    Statutory and Common Law Conversion

The facts relevant to the conversion claims are not in dispute for purposes of these motions.  Paul McCown transferred money to Defendant originating from a loan from Plaintiff to Paul.  At the time of that transfer, Defendant did not know that Paul obtained the loan through fraud.  Defendant then used some of the money to pay bills, still not knowing of Paul's fraud.  After learning of the fraud and being contacted by Plaintiff's attorney, Defendant hired counsel and the parties began discussing repayment of the money Defendant used, including giving Defendant an extension of time to acquire it.  Plaintiff would not accept return of the funds without additional payment to release all potential claims against Defendant, a counteroffer which Defendant did not accept.  After Plaintiff filed this case in November 2021, Defendant returned the money during February 2022.  Since there are no questions of material fact, what remains is determining whether Plaintiff is entitled to judgment as a matter of law.

The arguments are more fully developed below, but by way of background, Plaintiff argues it is entitled to judgment on these claims because Defendant did not return Plaintiff's funds when he learned of Paul's fraud.  Defendant argues both that these claims are improper attempts to sue him for breach of a contract he was not a party to (in response to Plaintiff's motion for summary judgment) and that these claims are subject to the choice of law provision in the contract between Plaintiff and Paul (in Defendant's motion for summary judgment) and should be assessed under New York law.

a.    Choice of Law

As Defendant notes, Michigan courts enforce contractual choice-of-law provisions. *MoneyForLawsuits V LP v. Rowe*, 2012 WL 1068171, at *6 (E.D. Mich. Jan. 23, 2012) (citing *Turcheck v. Amerifund Fin., Inc.,* 725 N.W.2d 684, 688 (Mich. Ct. App. 2006)).  This principal, however, generally extends only to those who are parties to the contract.  "[A]s a general rule, a non-party who is not an intended beneficiary has no right to enforce a contract." *Bold Home Prod., LLC v. CarbonKlean, LLC*, 2022 WL 1406649, at *4 (S.D. Ohio May 4, 2022) (citation omitted).  "A choice-of-law clause, like an arbitration clause, is a contractual right and generally may not be invoked by one who is not a party to the contract in which it appears." *In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017) (quoting *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1165 (9th Cir. 1996));

8

*see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (explaining that whether a choice-of-law provision applies depends on whether the parties agreed to be bound by the contract in which it appears).

The contract between Plaintiff and Paul McCown includes a choice of law provision.  It states, "This Note and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note and the transactions contemplated hereby and thereby shall be governed by the Laws of the State of New York."  (ECF No. 71-13, PageID.2556). Defendant argues that the money given to Defendant by his brother Paul derived from the loan from Plaintiff to Paul.  (ECF No. 74, PageID.3309).  Defendant contends that the money transferred from Paul to Defendant was a breach of the anti-transfer provision of the loan contract.  He then argues that Plaintiff's common law claim fails under New York law.

Defendant cited no authority to support that a choice of law provision applies to someone not a party to the contract in which the provision is found merely because property covered by the contract is given to them, and the Court knows of no such authority.  New York law does not apply to the dispute between Plaintiff and Defendant.  And as explained below, Defendant's theory that Plaintiff is suing him for breach of contract is untenable because Defendant was not a party to the contract between Plaintiff and Paul McCown.

In concluding that Michigan law applies, the Court will not address Defendant's argument related to New York common law conversion. Defendant's motion for summary judgment is denied as to Counts II and III.

       b.      Statutory Conversion M.C.L. § 600.2919a(1)(b)

A plaintiff is entitled to recovery for "[a]nother person's . . . possessing . . . converted property when the person . . . possessing . . . converted property knew that the property was . . . converted."  M.C.L. § 600.2919a(1)(b).

Preliminarily, Defendant argues that Plaintiff waived a claim under subsection (1)(b) of the conversion statute because it did not identify this subsection as providing the basis for a claim until its summary judgment motion. The Court is not convinced.  In the complaint, Plaintiff alleged that Defendant violated M.C.L. § 600.2919a by "wrongfully maintain[ing] possession of, and continu[ing] to conceal and convert, $23,699.33 of the $375,000 of [Plaintiff's] money that was fraudulently obtained by Paul. . . ."  (ECF No. 1, PageID.10, at ¶ 41).  This complaint language points to the statute, though it does not exactly mirror the language in subsection (1)(b), by alleging Defendant maintained possession of the funds fraudulently obtained by Paul McCown.[2]

---

[2] Plaintiff does not purport to bring any other statutory conversion claim against Defendant.

In Plaintiff's view, this is a simple case: Defendant was in possession of the funds remaining after the FBI seizure, and kept possession for eight months knowing during that time that his brother obtained the funds through fraud, i.e., that his brother converted the funds.  In Defendant's view, Plaintiff is impermissibly trying to shoehorn a breach of contract claim into a tort claim. Defendant argues there was no underlying "conversion" because the conduct that would constitute conversion is grounded in breach of contract, and there cannot be a separate tort of conversion for the same conduct.  Defendant also argues that Paul McCown obtained the money with Plaintiff's consent to the creation of a debtor-creditor relationship, so there is no conversion of funds.  (ECF No. 71, PageID.2296-98).  Defendant's arguments miss the mark.

To satisfy subsection (1)(b) of Michigan's statutory conversion statute, it must first be established that the property the defendant received or possessed was converted.  The definition of "converted" and elements for a conversion claim are supplied by Michigan common law.  "The Michigan Supreme Court defines conversion as 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'"  *In re Pixley*, 456 B.R. at 787–88 (quoting *Dep't of Agric. v. Appletree Mktg., L.L.C.,* 485 Mich. 1, 779 N.W.2d 237, 244 (2010)).  Where, as here, money is the property alleged to have been converted, "the defendant [(1)] must have obtained the money

without the owner's consent [(2)] to the creation of a debtor-creditor relationship and [(3)] must have had an obligation to return the specific money entrusted to his care." *In re Romanzi*, 31 F.4th 367, 381 (6th Cir. 2022) (quoting *Bastin v. Welch*, No. 251652, 2021 WL 2025148, at *4 (Mich. Ct. App. May 20, 2021)).

Paul McCown fraudulently misrepresented facts to obtain the loan. When Plaintiff loaned him the money, it did so without knowledge of the legitimate facts underlying the loan application. Thus, he obtained the money from Plaintiff without Plaintiff's full consent. The loan contract created a debtor-creditor relationship between Paul and Plaintiff. Paul, without question, had/has an obligation to return the money entrusted to his care. Thus, Paul converted the funds from Plaintiff.

The existence of the contract between Paul and Plaintiff does not preclude the Court from concluding that the money was converted for purposes of the statute. Defendant argues that Michigan's "economic loss doctrine" prohibits a contracting party from bringing tort claims that are factually indistinguishable from breach of contract claims. *See Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956). It "bars all tort remedies where the suit is between an aggrieved buyer and a [nonperforming] seller, the injury consists of damage to the goods themselves, and the only losses alleged are economic." *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.*, 480 N.W.2d 623, 627 (Mich. Ct. App. 1991); *Neibarger v. Universal*

12

*Coops., Inc.*, 486 N.W.2d 612, 615 (Mich. 1992).  Fraud in the inducement is an

exception to the economic loss doctrine.  *Huron Tool & Eng'g Co. v. Precision*

*Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995); *TSFR*

*Burger, LLC v. Starboard Grp. Of Great Lake, LLC*, 2019 WL 5597139, at *6

(E.D. Mich. Oct. 30, 2019).  Wyoming follows a similar doctrine, except it appears

Wyoming courts prefer not to entertain a fraudulent inducement claim when there

is a contract governing the loss.  *See Skyco Resources, LLP v. Family Tree Corp.*,

512 P.3d 11, 27-28 (Wy. 2022).

While it is true that Plaintiff could not sue Paul McCown in this Court for

conversion because its remedy adequately lies in breach of contract and fraudulent

inducement, this fact does not preclude application of the statute here.  Section

(1)(b) requires a showing that the defendant was in possession of converted

property.  This subsection does not require that the converter of the property also

be liable for conversion.  It requires only that the property was converted, and the

defendant-possessor knows the property was converted.

Plaintiff asserts that Defendant was in possession of some of the money

from Paul when he learned that the funds were obtained through fraud, or were

converted.  Defendant contends that he was not in possession when he learned of

the fraud because he had spent the money, relinquishing possession and control of

it.  He implies that he therefore cannot be liable for possessing the money.  (ECF

13

No. 71, PageID.2299-2300).  In its reply, Plaintiff maintains that it doesn't matter that Defendant spent the money because the statute does not require that he have dominion or actual physical control of the money to be liable for its return.  (ECF No. 72, PageID.3054).

The cases Defendant cites are unhelpful.  *Aroma Wines & Equip., Inc. v. Columbian Dist. Servs., Inc.*, 871 N.W.2d 136, 144 (Mich. 2015), lists refusing to surrender property on demand as one way conversion can be committed.  From this statement, Defendant infers that an act of dominion over the property is required.  The Court does not dispute this.  That said, the statutory conversion claim does not look to whether Defendant converted the funds, only whether he possessed funds that were knowingly converted.  *Aroma* does not answer the question whether a defendant must have actual possession and control of the property when he knows of the conversion.  He also cites *Drudge v. People's Wayne Cnty. Bank*, 251 N.W. 372, 372 (Mich. 1933).  That case is about whether the plaintiff cashed a check before the author of the check stopped payment.  The court concluded that the plaintiff had cashed the check when he gave it to the teller to deposit and got back $20 in cash from the check, depositing the rest in his account, all before the stop payment order was issued.  This does not aid our understanding of subsection (1)(b).

14

There appears to be no cases with a similar factual background—where the defendant obtained money, spent it, and later learned that money was ill-gotten. There are also no cases applying subsection (1)(b) when the defendant has already returned the converted property, as is the case now.  And Plaintiff did not cite authority to support its statement that the statute does not require dominion or actual physical control of the converted property.

It is unclear from a plain reading of the statute whether the person "possessing" the converted property must have actual possession of the property at the time the harmed party sues for damages.  The prefatory statement in the statute provides for recovery of actual damages, which does not necessarily mean recovery of the converted property.  With that in mind, Defendant could be held liable for actual damages for possessing, at one time, property converted by his brother.[3]  It is undisputed that Defendant was aware of Paul's conversion beginning sometime in June 2021, and did not return the funds until February 2022.

Defendant, as far as the Court is aware, is the only person who had possession of the funds and had knowledge that the funds were converted.  On these facts, Plaintiff is entitled to judgment on the claim, but this is a hollow

---

[3] This makes sense as a practical matter.  Plaintiffs in these cases cannot be required to follow the money or other property to the person or entity who has actual possession of the property.  That could mean investigating countless transactions.

victory because it has no right to any recovery.  "The measure of damages for conversion is the fair market value [of the property converted] at the time of the conversion."  *In re CMC Telecom, Inc.*, 383 B.R. 52, 65 (Bankr. E.D. Mich. 2008) (applying Michigan law).  Defendant returned the remaining money in February 2022.  Plaintiff was made whole at that time—it was given the fair market value of the property at the time of the conversion.  Plaintiff has no right to double recovery, thus there are no damages to award.

Plaintiff seeks treble damages against Defendant "[a]s a result of Defendant's steadfast refusal to return Plaintiff's funds."  (ECF No. 69, PageID.2160).  M.C.L. § 600.2919a(1) states that plaintiffs harmed by conversion "may recover 3 times the amount of action damages sustained[.]"  The Michigan Court of Appeals has explained that "[t]he term 'may' is permissive and indicates discretionary activity."  *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 844 N.W.2d 727, 732 (Mich. Ct. App. 2013).  "Treble damages are intended as a '*penalty,*' not an assessment of actual compensatory damages.  In other words, treble damages under this statute 'extend[ ] beyond restoring a plaintiff 'to their original condition' before the act of conversion.  Instead, the purpose of treble damages is 'to *penalize*' the converter."  *Hunt v. Hadden*, 127 F. Supp. 3d 780, 784 (E.D. Mich. 2015).

The Court will not award treble damages.  First, since Defendant has already returned the fair market value of the money converted by Paul, there are no damages to treble.  Second, on the facts before the Court, the Court finds no wrongdoing on Defendant's behalf to "penalize."  Instead, the facts show the parties in active negotiations for the return of the remaining funds, rather than a bad intent by Defendant to keep the money.  When Plaintiff demanded return of the funds on September 30, 2021, Defendant's counsel requested an extension of time for Defendant to obtain the money.  Then, through counsel, Defendant offered to return the entire amount owed with a release of all claims.  Plaintiff refused to accept return of the funds on that condition because it was unconvinced that Defendant played no role in the fraud.  To quell those fears, during October 2021 Defendant offered himself to be deposed or answer questions in another format and to provide discovery to show that he was uninvolved.  Plaintiff refused this offer. Although it was Plaintiff's right to refuse the return of money with conditions, Plaintiff cannot expect treble damages after refusing the return of the entire amount owed after some fact-finding.  Then Plaintiff filed this lawsuit in December 2021, initiating adversarial proceedings against Defendant.  In February 2022, Defendant returned the remaining amount.  Defendant did not "steadfastly" refuse to return the money, and did not hold on to the money in a way that a penalty would prevent future such conduct.  As a result, treble damages will not be awarded.

The statute also provides that fees and costs may be awarded for having to prosecute the action for the return of the property. Attorney fees and costs are also discretionary. *See id.* at 787-88. Plaintiff chose to prosecute this action because Defendant would not return the remaining funds without agreeing to a release of all potential claims. As noted, the parties were in negotiations for the return of the property when this suit was filed. What measure of fees and costs are due to a party who prosecutes an action for return of property the defendant would return before the suit , but only if the plaintiff agreed to release all potential claims? Because Defendant placed some condition on the return of the property he did not have a right to possess, the Court finds some fees and costs are awardable. Any award of fees and costs, however, ends at the time of the return of the money in February 2022. The Court caps the period at the return of the funds because Defendant was not acting in bad faith in requesting a without-prejudice settlement and holding the funds in his attorney's account until an agreement was reached.

So Plaintiff is awarded fees and costs in bringing this action up to the point of the return of the property. To be clear, the fees and costs awarded are those incurred *bringing* this action—the filing fee, the cost of drafting and serving the complaint, and other costs related to bringing this action. The Court is not awarding fees and costs incurred in negotiating the return of the funds or for litigation after Defendant returned the funds. The parties are directed to confer on

these costs.  If no agreement is reached, Plaintiff must contact the Court's

chambers for further direction, likely to include filing a bill of costs and allowing a

response by Defendant.

    c.  Michigan Common Law Conversion

  Under Michigan common law, "[c]onversion is any distinct act of dominion

wrongfully exerted over another's personal property in denial of or inconsistent

with his rights therein." *Aroma Wines & Equip.*, 871 N.W.2d at 141 (Mich. 2015)

(quoting *Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960)).

When money is the property at issue, as mentioned above, the standard changes

slightly.  The standard Plaintiff cites states that money is converted when there is

an obligation to deliver that specific money.  (ECF No. 6, PageID.2159) (citing

*Aroma Wines & Equip.*, 497 Mich. 337).  More recently, as cited by the Defendant,

the Michigan Court of Appeals stated the standard includes the requirement of the

creation of a debtor-creditor relationship.  The Court relies on the more recent

standard: "the defendant [(1)] must have obtained the money without the owner's

consent [(2)] to the creation of a debtor-creditor relationship and [(3)] must have

had an obligation to return the specific money entrusted to his care." *In re

Romanzi*, 31 F.4th at 381.

  Unlike Michigan's statutory conversion in subsection (1)(b), common law

conversion does not look to conduct by third parties.  Common law conversion

asks whether Defendant himself converted Plaintiff's money.  The facts show that Defendant did not convert Plaintiff's property.

Defendant did not obtain the money with Plaintiff's express consent.  As Plaintiff concedes, Defendant "was a total stranger" to Plaintiff.  (ECF No. 72, PageID.3051).  While Plaintiff was unaware that Defendant received some of the loan money, the transaction between Paul and Defendant itself was not against Plaintiff's interest in the money; Paul's fraud was against Plaintiff's interest.  The transaction between Paul and Defendant did not create a debtor-creditor relationship, either between Paul and Defendant or between Plaintiff and Defendant.  When Defendant received the money, he was unaware of any wrongdoing.  Without these showings, the Court cannot conclude that Defendant converted Plaintiff's funds when he did not return the funds until February 2022.  Summary judgment is denied to Plaintiff on this claim.[4]

Summary judgment is granted in Defendant's favor on the common law conversion claim because there are no facts on which Plaintiff would be entitled to judgment on this claim.  In his response brief, Defendant cited Fed. R. Civ. P. 56(f)(1) to award summary judgment in his favor on Counts II and III.  In its reply

---

[4] Even if Plaintiff were entitled to judgment on this claim, it would be another hollow victory because "[]t]he measure of damages for [common law] conversion is the fair market value [of the property converted] at the time of the conversion."  *In re CMC Telecom, Inc.*, 383 B.R. at 65.  Since Defendant returned all the funds, the measure of damages is $0.

brief, Plaintiff characterized the response brief as a cross-motion for summary judgment, which is not accurate.  Still, Plaintiff knew that Defendant was seeking judgment on the same claims as Plaintiff.  Under Fed. R. Civ. P. 56(f)(1), the Court can grant summary judgment for a nonmovant after giving notice and a reasonable time to respond.  *See also* § 2720.1 Procedure on a Motion for Summary Judgment—Summary Judgment Without a Motion, 10A Fed. Prac. & Proc. Civ. § 2720.1 (4th ed.) ("When there has been a motion but no cross-motion, the judge already is engaged in determining whether a genuine dispute as to material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment.").  Plaintiff had notice that summary judgment could be granted in Defendant's favor, and had a reasonable time to respond.  Defendant's receipt of the money and conduct after receipt do not satisfy the elements of common law conversion.  His initial receipt of the funds was not wrongful, and no debtor-creditor relationship was created obligating Defendant to return the money to Plaintiff.

          2.    MUVTA

Defendant moves for summary judgment on Plaintiff's Count I - Michigan Uniform Void Transactions Act ("MUVTA"), M.C.L. § 566.34.

Defendant begins the discussion of the MUVTA claim with addressing the issue of the amount in controversy in this diversity jurisdiction case.  He did not

*argue* that the amount in controversy requirement was not met.  (ECF No. 74, PageID.3316-17).  Since there is no such argument, the Court will not address this issue.

Next, Defendant argues that Plaintiff's recourse for return of the funds is through the forfeiture action in Wyoming District Court, not through state-law claims in this Court.  (*Id.* at PageID.3317-18).  The Wyoming District Court indeed disbursed the money seized by the government in the criminal action against Paul McCown.  He cites *De Almeida v. United States*, 459 F.3d 377 (2d Cir. 2006) in support of his argument.  That case explains when a third party to a criminal proceeding should file an ancillary proceeding or a Federal Rule of Criminal Procedure 41(g) motion.  Because Plaintiff is not challenging the government's seizure of the money it loaned to Paul McCown, this line of argument is inapplicable here.

The last argument relates directly to MUVTA.  Plaintiff sues Defendant for violations of M.C.L. § 566.34(1)(a) and (b).  Subsection (1)(a) provides that a transfer made by a debtor (Paul McCown) is voidable as to the creditor (Plaintiff) if the transfer was made with "actual intent to hinder, delay or defraud" the creditor.  Plaintiff alleges, in conclusory fashion, that Paul McCown, "with the intent to hinder, delay or defraud" Plaintiff, transferred $375,000 to Defendant. (ECF No. 1, PageID.6, ¶ 24).  The statute requires "actual intent" to hinder or

22

defraud the creditor by way of the transfer.  To determine actual intent, the statute lists several factors to consider.  M.C.L. § 566.34(2).  These include whether the transfer was to an insider, whether the debtor maintained control of the property transferred, whether the transfer was concealed, whether the debtor was sued or threatened with suit before the transfer, whether the debtor became insolvent shortly after the transfer, and whether the transfer was of substantially of the debtor's assets.  These factors are so-called "badges of fraud," circumstances usually attending fraudulent transfers such that an inference of fraud arises from them.  *In re Energy Conversion Devices, Inc.*, 621 B.R. 674, 750 (Bankr. E.D. Mich. 2020).

Plaintiff has marshaled no evidence establishing any of these factors.  Instead, the evidence shows that Paul gave Defendant money for a non-fraudulent reason (that reason the parties contest, as discussed next).  Summary judgment will be awarded to Defendant on the M.C.L. § 566.34(1)(a) claim.

Subsection (1)(b) voids a transfer if the debtor transferred the property "[w]ithout receiving a reasonably equivalent value in exchange for the transfer . . . **and** the debtor . . . (i) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the . . . transaction; or (ii) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the

debtor's ability to pay as they became due." M.C.L. § 566.34(1)(b) (emphasis added). The inclusion of "and" in the statute means that the Court or jury must find both that the transfer occurred without reasonably equivalent consideration *and* one of the two other requirements. Both parties focus their argument on the introductory statement of the subsection—whether Paul McCown received a reasonably equivalent value in exchange for the transfer of $375,000. Defendant argues the money was payment for his 5% share in McCown Enterprises, and the share was given to him for his hand sanitizer formula that McCown Enterprises produced and sold (ECF No. 74, PageID.3318). Plaintiff contends that neither the money nor the 5% share were in consideration for the sanitizer formula; Plaintiff insists Defendant is propounding a falsehood and instead received $375,000 for no consideration. (ECF No. 77, PageID.4290-92).

Neither party addresses either of the two other findings that must exist for liability to stand—whether Paul McCown was engaged in business or transactions for which the remaining funds after the transfer were unreasonably small, or whether he intended to incur or believed he would incur debts beyond his ability to pay. Defendant likely neglected to address these requirements because he rested on his argument that he received the money in consideration for the sanitizer formula. But whatever the reasons for the parties' failure to address the remaining requirements to void the transaction under subsection (1)(b), it is inescapable that

24

there is no evidence supporting either.  There is no evidence on which a jury could conclude that Paul McCown was engaged in business for which there were no funds after the transfer.  There is no evidence on which a jury could conclude that Paul McCown incurred debts, or should have known he would incur debts, beyond his ability to pay after the transfer.

In short, though there may be a question about the reason for the transfer of funds to Defendant, since neither subsections (b)(i) or (b)(ii) were met, that question of fact is not material.  In other words, even if Paul McCown transferred the funds to Defendant for no reason or no consideration, the Court is not in a position to void that transaction because there is no evidence that Paul McCown was left with no funds for business purposes or to pay debts after the transfer. Thus, Defendant is entitled to judgment as a matter of law on the claim.

In conclusion, the motions are adjudicated as follows:

- Plaintiff's motion for partial summary judgment is **GRANTED** as to the statutory conversion claim, but **DENIED** as to the common law conversion claim.  Plaintiff is not entitled to recovery on the statutory conversion claim.

- Defendant is entitled to judgment on the common law conversion claim as argued in Plaintiff's motion for partial summary judgment under Fed. R. Civ. P. 56(f).

- Defendant's motion for partial summary judgment is **GRANTED** as to the MUVTA claims, but **DENIED** as to the remainder.

- Judgment having been rendered on all claims, this case is **DISMISSED**.

## III.   MOTION TO FILE EXPERT WITNESS LIST UNDER SEAL

Defendant moved for leave to file under seal a copy of his expert witness list, which lists only him as an expert witness. Included in this witness list is a document that contains his proprietary sanitizer formular that was marked Confidential under the parties' protective order. (ECF No. 57, PageID.1862). A redacted copy was filed January 30, 2023. (ECF No. 56). Plaintiff does not oppose filing the document under seal.

To begin, the motion is procedurally deficient. Local Rule 5.3 provides procedures for filing civil material under seal. Rule 5.3(b) governs here because no rule or statute is cited as authorizing sealing the witness list document. Rule 5.3(b) requires, among other things, that an unredacted version of the subject document be filed under seal for evaluation by the Court. But this minor failing is not reason to deny the unopposed motion. The Court highlights this issue and the Local Rule for the parties' future litigation.

It is also worth mentioning that in this Circuit, Courts are not permitted to take motions to seal lightly. The Sixth Circuit has long recognized a "strong presumption in favor of openness" in court records. *Rudd Equip. Co., Inc. v. John*

26

*Deere Constr. & Forestry Co.*, 834 F.3d 589, 593 (6th Cir. 2016) (citing *Brown &*

*Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)).  The

"heavy" burden of overcoming that presumption rests with the party seeking to

seal the records.  *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d

299, 305 (6th Cir. 2016).  The moving party must show that it will suffer a "clearly

defined and serious injury" if the judicial records are not sealed.  *Id.* at 307.  This

burden must be met **even if no party objects to the seal**, and it requires a

"document-by-document, line-by-line" demonstration that the information in the

document meets the "demanding" requirements for the seal.  *Id.* at 308.  In

delineating the injury to be prevented, "specificity is essential."  *Id*.  Typically,

"only trade secrets, information covered by a recognized privilege (such as

attorney-client privilege), and information required by statute to be maintained in

confidence (such as the name of a minor victim of a sexual assault)" are enough to

overcome the presumption of access.  *Id.*

Should the Court order a document to be sealed, the Court must articulate

why the interests supporting nondisclosure are compelling, why the interests

supporting public access are not as compelling, and why the scope of the seal is no

broader than necessary.  *Id.* at 306.

The Court will **GRANT** the seal here because Defendant's proprietary

sanitizer formula is not of great consequence to the issues in this case, and thus the

public does not have a strong interest in viewing information about the formula.
The unredacted sealed copy of the expert witness list must be filed **within 5 business days** of this Order.

## IV.    MOTION TO COMPEL DEPOSITION (ECF No. 73)

This motion is **TERMINATED AS MOOT** considering the conclusions above granting summary judgment on all claims.  There is no need for further discovery.

## V.    MOTION FOR SANCTIONS (ECF NO. 81) AND MOTION TO STAY (ECF NO. 82)

Plaintiff seeks sanctions against Defendant's counsel under 28 U.S.C. § 1927 for purportedly duplicative, frivolous, vexatious, and harassing behavior throughout the litigation.  Plaintiff accuses counsel of filing baseless discovery motions to increase the cost of litigation.  It states that counsel "obstinately refused" to stipulate to extend a stay while Plaintiff was trying to receive funds seized by the FBI, and refused to accept an offer to dismiss this case without prejudice.  Then, counsel asserted that Defendant did not have to engage in discovery and abruptly ended a telephonic discovery conference with Plaintiff.  In one of his motions, counsel disclosed confidential settlement communications, which the Court struck.  The Court also denied a motion to compel because Defendant was trying to obtain attorney-client privileged communications.  Plaintiff also notes that Defense counsel sought summary judgment in his response

28

to Plaintiff's motion for partial summary judgment, then also filed a separate

motion for summary judgment.  Finally, Plaintiff seeks sanctions for Defense

counsel's behavior around and during the deposition of Plaintiff's corporate

representative, Mr. Kang.  Plaintiff asserts that counsel bullied the deponent and

asked frivolous questions, rather than asking questions pertinent to the litigation,

and provided exhibits only minutes before the deposition that were out of order.

Some questions posed to Mr. Kang included whether any family members

committed crimes, his views on Covid-19, and his religious beliefs.  Plaintiff also

accuses counsel of contacting Plaintiff's prior counsel's office personnel for

information.  (ECF No. 81, PageID.4351-65).

Defendant moved the Court for an order staying briefing on the matter of

sanctions until after a decision on the motions for summary judgment.  (ECF No.

82).

28 U.S.C. § 1927 provides as follows:

> Any attorney or other person admitted to conduct cases in
> any court of the United States . . . who so multiplies the
> proceedings in any case unreasonably and vexatiously
> may be required by the court to satisfy personally the
> excess costs, expenses, and attorneys' fees reasonably
> incurred because of such conduct.

Sanctions under § 1927 are warranted "when an attorney objectively falls short of

the obligations owed by a member of the bar to the court and which, as a result,

causes additional expense to the opposing party." *Oakstone Comm. Sch. v.*

29

*Williams*, 615 F. App'x 284, 289 (6th Cir. 2015) (citation omitted).  Section

1927 requires more than a mere showing of negligence or incompetence, although

it does not require a showing of subjective bad faith.  *Id*.  "We construe

'vexatiously multiplying proceedings' to include conduct where 'an attorney

knows or reasonably should know that a claim pursued is frivolous, or that his or

her litigation tactics will needlessly obstruct the litigation of non-frivolous

claims.'"  *Shepherd v. Wellman*, 313 F.3d 963, 969 (6th Cir. 2002) (quoting *Jones

v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986)).  "[A]n attorney is liable

under § 1927 solely for excessive costs resulting from the violative conduct."

*Ridder v. City of Springfield*, 109 F.3d 288, 299 (6th Cir. 1997).

　　　　That Defense counsel moved to compel discovery that the Court determined

would infringe on the attorney-client privilege, and pursued a line of deposition

questioning that perhaps is questionable is not grounds for sanctions.  Neither is

the refusal to accept dismissal without prejudice.  Remember, Defendant offered to

return the money before the litigation with a release of all claims, but Plaintiff

refused.  It is no surprise that Defendant would not accept a dismissal without

prejudice during the litigation.  While the parties and the Court expended time and

resources addressing Defendant's motions, the Court cannot say, based on the

briefing and the history of this litigation, that Defense counsel needlessly

obstructed the litigation.  As for whether any of Defendant's arguments or lines of

questioning are or were frivolous, the Court would point out the near-frivolous

nature of parts of Plaintiff's claims.  For example, Plaintiff pursued a claim against

Defendant under MUVTA without any evidence that the transfer from Paul

McCown to Defendant was intended to delay, hinder, or defraud Plaintiff.  Neither

party has exhibited models of cooperative and efficient litigation.

The motion for sanctions is **DENIED**.  The motion to stay is

**TERMINATED AS MOOT**.

**IT IS SO ORDERED**.

Date: June 30, 2023                              <u>s/Curtis Ivy, Jr.</u>
                                                 Curtis Ivy, Jr.
                                                 United States Magistrate Judge